DELGADILLO *v.* CARMICHAEL, DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE.

No. 63. Argued October 22, 1947.—Decided November 10, 1947.

*Fred Okrand* argued the cause for petitioner. With him on the brief was *A. L. Wirin.*

*Robert W. Ginnane* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Robert S. Erdahl* and *Sheldon E. Bernstein.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner is detained by respondent under a deportation order, the validity of which is challenged by a petition for a writ of habeas corpus. The District Court granted the petition and discharged petitioner. The Circuit Court of Appeals reversed. 159 F. 2d 130. The case is here on a petition for a writ of certiorari which we granted because of the seeming conflict between the decision below and *Di Pasquale* v. *Karnuth,* 158 F. 2d 878, from the Second Circuit Court of Appeals.

Petitioner is a Mexican citizen who made legal entry into this country in 1923 and resided here continuously until 1942. In June of that year, when this nation was engaged in hostilities with Germany and Japan, he shipped out of Los Angeles on an intercoastal voyage to New York City as a member of the crew of an American merchant ship. The ship was torpedoed after passing through the Panama Canal on its way to New York City. Petitioner was rescued and taken to Havana, Cuba, where he was taken care of by the American Consul for about one week. On July 19, 1942, he was returned to the United States through Miami, Florida, and thereafter continued to serve as a seaman in the merchant fleet of this nation. In March 1944 he was convicted in California of second-

degree robbery and sentenced to imprisonment for a term of one year to life. While he was confined in the California prison, proceedings for deportation were commenced against him under § 19 (a) of the Immigration Act of February 5, 1917, 39 Stat. 874, as amended 54 Stat. 671, 8 U. S. C. § 155 (a).

That section provides in part:

> ". . . any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States . . . shall, upon the warrant of the Attorney General, be taken into custody and deported. . . ."

Those requirements for deportation are satisfied if petitioner's passage from Havana, Cuba, to Miami, Florida, on July 19, 1942, was "the entry of the alien to the United States" within the meaning of the Act.

In *United States ex rel. Claussen* v. *Day,* 279 U. S. 398, *United States ex rel. Stapf* v. *Corsi,* 287 U. S. 129, and *United States ex rel. Volpe* v. *Smith,* 289 U. S. 422, there is language which taken from its context suggests that every return of an alien from a foreign country to the United States constitutes an "entry" within the meaning of the Act. Thus in the *Smith* case it was stated, 289 U. S. p. 425, that "any coming of an alien from a foreign country into the United States whether such coming be the first or any subsequent one" is such an "entry." But those were cases where the alien plainly expected or planned to enter a foreign port or place. Here he was catapulted into the ocean, rescued, and taken to Cuba. He had no part in selecting the foreign port as his destination. His itinerary was forced on him by wholly fortuitous circumstances. If, nonetheless, his return to this country was an "entry" into the United States within the meaning of the Act, the

law has been given a capricious application as *Di Pasquale* v. *Karnuth, supra,* suggests.

In that case an alien traveled between Buffalo and Detroit on a railroad which, unknown to him, passed through Canada. He was asleep during the time he was in transit through Canada and was quite unaware that he had left or returned to this country. The court refused to hold that the alien had made an "entry," for to do so would impute to Congress a purpose to subject aliens "to the sport of chance." 158 F. 2d 879. In this case petitioner, of course, chose to return to this country, knowing he was in a foreign place. But the exigencies of war, not his voluntary act, put him on foreign soil.[1] It would indeed be harsh to read the statute so as to add the peril of deportation to such perils of the sea. We might as well hold that if he had been kidnapped and taken to Cuba, he made a statutory "entry" on his voluntary return. Respect for law does not thrive on captious interpretations.

Deportation can be the equivalent of banishment or exile. See *Bridges* v. *Wixon,* 326 U. S. 135, 147. The stakes are indeed high and momentous for the alien who has acquired his residence here. We will not attribute to Congress a purpose to make his right to remain here dependent on circumstances so fortuitous and capricious as those upon which the Immigration Service has here seized. The hazards to which we are now asked to subject the alien are too irrational to square with the statutory scheme.

Other grounds are now sought to be advanced for the first time in support of the deportation order. They are not open on the record before us.

*Reversed.*

---

[1] If his intercoastal voyage had continued without interruption, it is clear that he would not have made an "entry" when he landed at its termination. *United States ex rel. Claussen* v. *Day, supra,* p. 401.